**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| **CURTIS FRAZIER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 1:09-0022** |
| **v.** | ) | **JUDGE ECHOLS** |
| | ) | |
| **PHILLIP'S MASONRY GROUP, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Defendant Phillip's Masonry Group, Inc. ("Defendant") filed a Motion for Summary Judgment (Docket Entry No. 9), to which Plaintiff Curtis Frazier ("Plaintiff") filed a response in opposition (Docket Entry No. 12), and Defendant filed a reply (Docket Entry No. 19).

Plaintiff is an African American brick mason whose employment was terminated by the Defendant. Plaintiff alleged in his Complaint that Defendant discriminated against him on the basis of race in the terms and conditions of employment and by terminating his employment, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.,* and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.* Plaintiff also alleged that Defendant retaliated against him for opposing unlawful race discrimination, in violation of Title VII and the THRA. Plaintiff also raised state-law claims that Defendant terminated his employment in violation of the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304, and Tennessee common law solely because he reported Defendant's unlawful pay practice. Plaintiff seeks compensatory and punitive damages, back pay, front pay, attorney's fees, prejudgment interest, and other relief.

1

# I. <u>FACTS</u>

Defendant is a corporation engaged in the masonry business.  Phillip Dwayne Rochelle ("Phillip") is the President of the corporation.  Marvin Loy Rochelle ("Marvin"), Phillip's uncle, is a brick mason and foreman employed by Defendant.

On March 11, 2006, Defendant hired Plaintiff as a brick mason and agreed to pay him the union scale of $23.03 per hour, although Defendant was not a union shop and Plaintiff was not a member of the union.  On May 1, 2006, the union scale increased from $23.03 per hour to $23.52 per hour.  Defendant increased Plaintiff's pay from $23.03 to $23.52 per hour.

In the summer of 2006, Defendant adopted a policy of paying brick masons based upon merit rather than the union scale.  As such, brick masons were paid different hourly rates based on their work performance.  Phillip testified he held a meeting with all of the union brick masons and told them the pay rate was changing.  (Docket Entry No. 11-1, Phillip Rochelle Depo. at 32-33.)  Plaintiff denies that Phillip told him the pay policy was changing.

On May 1, 2007, the union scale increased from $23.52 per hour to $24.02 per hour.  Plaintiff's pay rate did not increase, but remained at $23.52 per hour.[1]  Phillip did not give Plaintiff a raise because he was not as good a brick mason as others employed by the company.  Plaintiff contends he did not know about the May 1, 2007 increase in the union scale.

On December 7, 2007, Defendant laid off Plaintiff and other brick masons due to lack of work.  After the layoff, Plaintiff found work at Music City Masonry for approximately two months,

---

[1]Defendant later rounded the rate to $23.50 for ease in calculating overtime.  (Docket Entry No. 15-1, Phillip Rochelle Depo. at 34-35.)

2

where he was paid $24.00 per hour, an amount Plaintiff knew to be prevailing union scale. (Docket Entry No. 14-1, Frazier Depo. at 23.)

While working at Music City Masonry, Plaintiff called Phillip to ask if there was enough work for him to return. Plaintiff preferred to work for Defendant because he would get insurance in addition to wages. (Id. at 24.) Phillip told Plaintiff there was sufficient work for him, so Plaintiff returned to employment by Defendant on March 10, 2008. Plaintiff and Phillip did not discuss the rate of pay when Plaintiff returned to work, (id. at 20), and Defendant paid Plaintiff $23.50 per hour, the same rate Plaintiff earned before the layoff. Plaintiff testified that he knew Defendant was paying him $23.50 per hour because he looked at his paycheck stub at the end of the week and he knew union scale was $24.00, but he was not paying any attention to his pay when he went back to work for Phillip "until later." (Id. at 20, 22-25.) Plaintiff also claims, inconsistently, that he did not know he was not receiving union scale until over a year later in May 2008 when he spoke to a former co-worker, Gary Canon, about pay rates. (Id. at 22-23.)

On March 10, 2008, the day Plaintiff returned to work after layoff, Defendant employed eight (8) brick masons. Three (3) of the brick masons earned $24.00 per hour, and all three were white. Three (3) of the brick masons earned $23.50 per hour; one (1) of them was white and the other two (2) were African American. One (1) brick mason earned $22.00 per hour and he was white. One (1) brick mason earned $20.00 per hour and he was white. Plaintiff claims he was Defendant's third most senior brick mason. He also claims he was the only African American among the six most senior brick masons and the only brick mason of the six most senior to not be paid $24.00 per hour. Phillip testified that, during this same period in 2008, his stepson, who lived

3

in his home, worked for the company and Phillip lowered his pay because he did not perform as expected. (Docket Entry No. 15-1, Phillip Rochelle Depo. at 53-54.)

On April 4, 2008, Plaintiff left the job site to which he was assigned because he did not want to work with an apprentice. Plaintiff denies that he did anything wrong in leaving the job site. According to Plaintiff, he left the job site with the permission of his foreman in order to travel to another job site to speak with Phillip about a work problem Plaintiff was having with the apprentice. When Plaintiff complained to Phillip about the apprentice, Phillip replied, "Well, you are supposed to show him what to do." (Frazier Depo. at 28-29.) Plaintiff denied it was his responsibility to train apprentices and Phillip told him he did not have to train them. (Id. at 29.) Plaintiff was not disciplined over the matter, and he returned to his assigned work site the next day. (Id. at 29-30.)

From April 18, 2008, until May 16, 2008, Plaintiff was assigned to Defendant's work site at the Humphreys County Building for Higher Education. Plaintiff laid block for a wall, but his wall was not on the same level as the wall another brick mason built. Phillip testified there was a hump in the foundation concrete on the side where Plaintiff was building a wall, and Plaintiff should have adjusted the blocks and mortar to account for the uneven foundation. The job superintendent told Plaintiff his wall was not level before the wall got scaffold high and that it needed to be taken down and put back on the level, but Plaintiff continued to build the wall anyway. Because the walls ended up on different levels, Defendant had to tear down and rebuild the wall that Plaintiff built. (Docket Entry No. 15-2, Phillip Rochelle Depo. at 65-69.) Plaintiff denies he did anything inappropriate; rather, he states that he built his section of the wall correctly, but another of Defendant's employees erred in the construction of the other wall section. Plaintiff also alleges that he offered to tear the wall down. (Docket Entry No. 11-2, Frazier Depo. at 34-36.) Plaintiff claims his foreman did not

4

suggest his work was anything other than satisfactory, and he was not disciplined because of the wall problem.

Plaintiff worked on several jobs for Defendant where Marvin was the foreman. Marvin thought that Plaintiff was rough on a lot of his work and that he did not lay enough block. (Docket Entry No. 11-3, Marvin Rochelle Depo. at 15.) Plaintiff disputes this, claiming Marvin never said or suggested that his work was anything other than satisfactory, and building corner block is time-consuming work. Plaintiff claims he was not given a single written counseling or reprimand of any kind. He also asserts there is no written record of any inadequate performance by him.

From May 19, 2008, to May 30, 2008, Plaintiff worked on the White Bluff fire hall job. One day while working on that job site, a concrete delivery did not arrive until late in the day. Plaintiff left the job site before the concrete was poured, while the other employees stayed late to pour the concrete. Plaintiff disputes that he did anything wrong at the White Bluff job. Plaintiff's normal workday was from 7:00 a.m. to 3:30 p.m. The crew expected a concrete truck to arrive by 12:30 p.m., but by 3:45 p.m. the truck still had not arrived. Since the foreman and crew did not know what time the truck would arrive, Plaintiff requested permission to leave the site at 3:45 p.m. in order to make a truck payment that was due.

Phillip called the foreman to check on the concrete pour and learned that Plaintiff had left the job site early because he was upset about his pay and he had a truck payment to make. Phillip called Plaintiff and both men were "hot" during the conversation. According to Phillip, Plaintiff was hateful and smart and stated at one point: "Don't talk to me like that. You come up here and I will mess you up." (Docket Entry No. 15-2, Phillip Rochelle Depo. at 75.) Plaintiff complained to Phillip, as he had once before, that he was not being paid like everyone else due to his race. Phillip

5

responded that he agreed to pay Plaintiff union scale when he first started, but then the company went to a merit system and he gave employees raises when he felt they merited raises. Phillip told Plaintiff there were brick masons getting paid less than he was. (Id. at 72-76, 78, 84-85.) Plaintiff insisted Phillip had agreed to pay him union scale. Phillip then agreed to give Plaintiff a retroactive raise and pay him union scale at $24.00 per hour if Plaintiff would straighten up and do his job. Phillip did not want a problem with Plaintiff because he lived and worked in the same county. It was worth it to Phillip to pay back pay if Plaintiff would do his job. Phillip testified he was not upset that Plaintiff claimed he was paid less due to his race; what bothered him was that he thought he and Plaintiff were friends and Plaintiff knew better than that. (Id. at 86-88.) Plaintiff was not disciplined for leaving the job site before the concrete was poured.

Plaintiff testified that, before this telephone conversation with Phillip occurred, he had already made complaints to Phillip and Marvin that Caucasian brick masons were being paid more than he was because of his race, and Plaintiff claimed to be Defendant's only African American brick mason. (Frazier Depo. at 46-47, 78.) According to Plaintiff, Phillip promised he would fix it and make it right. Phillip agreed to increase Plaintiff's hourly pay to $24.00 per hour and to pay Plaintiff back pay of 50 cents per hour. Plaintiff also testified that he felt he was entitled to the higher wage because of his experience, but he denied that he should receive the higher wage based on seniority. He only wanted to receive union scale. (Id. at 62.)

From June 2, 2008, until June 13, 2008, Plaintiff worked on the Westwood Elementary job. Marvin Rochelle was the foreman.

On June 13, 2008, Phillip went to the Westwood Elementary job site to take payroll checks to Marvin. He also took with him a check made payable to Plaintiff for payment of 50 cents per

6

hour for 1,437 hours, which was the amount required to increase Plaintiff's pay retroactively to May 1, 2007, when the union wage increased. Phillip asked Plaintiff to come to his truck to talk. Phillip handed the check to Plaintiff and explained the amount and the deductions that were taken. According to Phillip, Plaintiff seemed satisfied. Phillip told Plaintiff: "Curtis, I don't think I owe you this money, but I'm going to pay this money just to get you happy and maybe you'll get on with doing your work. That's what I want you to do. I don't want us to be enemies or have to do anything, I just want you to do your work." (Docket Entry No. 11-1, Phillip Rochelle Depo. at 96-97.) According to Phillip, Plaintiff agreed. Phillip instructed the Plaintiff: "You know, when you go back to work . . . I want you to be doing your work the second you go back, not tomorrow or the next day. Just go ahead and get your work done." (Id. at 97.) Phillip then left the job site. According to Plaintiff, when Phillip told him he did not think he owed him the money, Plaintiff answered, "Well, you really do, because we agreed – you agreed you would pay me union scale." (Frazier Depo. at 68.)

Marvin testified Plaintiff returned to the job site angry because the check Phillip gave him was not as much as Plaintiff thought he was supposed to receive, and Plaintiff suggested he might quit. Plaintiff did very little work the rest of the day. Marvin told Plaintiff two or three times he needed to go to work and get his job done; however, Plaintiff kept going to the bathroom every few minutes, he went to his truck or stood around, or he was on his cell phone with his girlfriend. Marvin also testified that the corner block lead Plaintiff built that day was out of plumb and had to be torn down the next day. (Docket Entry No. 15-3, Marvin Rochelle Depo. at 20-21.)

Plaintiff disputes all of this. He testified he returned to work building corners after he received the check from Phillip, and Marvin did not speak to him or criticize his work. In addition,

7

a load of concrete arrived, and Plaintiff stopped laying block to help pour the concrete. (Frazier Depo. at 68, 70.) Plaintiff claims that, by lunchtime, after meeting with Phillip to discuss the back pay check and after pouring a load of concrete, he had laid 80 to 85 blocks, and by Phillip's own estimate, a producing brick mason can lay 100-150 blocks in a day when building corners. (Id. at 69; Docket Entry No. 15-1, Phillip Rochelle Depo. at 26.)

About noontime, Phillip called Marvin to ask how everything was going on the job site. Marvin reported that Plaintiff came back to the job site angry after getting the check and he was not doing any work. Phillip asked Marvin, "What do we need to do? Do I need to fire him?" Marvin responded, "Yeah, that's what I'd do, because he's not going to listen to me." Phillip instructed Marvin to have Plaintiff call him. (Docket Entry No. 15-2, Phillip Rochelle Depo. at 98-99; Marvin Rochelle Depo. at 21-22.) According to Phillip and Marvin, Phillip had to call the job site with the same instruction two more times before Plaintiff finally called him. (Phillip Rochelle Depo. at 100-101; Marvin Rochelle Depo. at 21-23.) Plaintiff testified he called Phillip as directed as soon as Marvin told him to do so. (Frazier Depo. at 70.) When Plaintiff called, Phillip told Plaintiff he needed to find another job.

Plaintiff then asked Marvin why he was fired, and Marvin told him he was fired because he did not make production. Plaintiff and Marvin exchanged words. (Id. at 71; Marvin Rochelle Depo. at 23-26.) According to Marvin, Plaintiff twice threatened: "I'll pop a cap in your ass." (Marvin Rochelle Depo. at 25-26.) Plaintiff denies that he threatened to shoot Marvin. (Frazier Depo. at 71.) The job superintendent heard the commotion and told Plaintiff to leave, so Plaintiff left the job site. (Marvin Rochelle Depo. at 26.)

On the day Plaintiff's employment was terminated, Defendant employed twenty-two (22) brick masons. Five (5) were paid $24.00 per hour, and all of them were white. Eleven (11) of the brick masons were paid $23.50 per hour, with six (6) of them African American and five (5) of them white. Three (3) brick masons were paid $22.00 per hour and all of them were white. Three (3) brick masons were paid $20.00 per hour and all three of them were white. Plaintiff claims that he was Defendant's third most senior brick mason, the only African American among the six most senior brick masons, and the only one of the six most senior brick masons not to be paid $24.00 per hour.

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to

9

support the nonmoving party's case.  <u>Celotex</u>, 477 U.S. at 325.  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248.  In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor.  <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

### III.  <u>ANALYSIS</u>

Plaintiff contends that Defendant discriminated against him based on race in determining the rate of his pay and in terminating his employment, in violation of Title VII and the THRA.  Plaintiff also alleges that Defendant retaliated against him when he complained about his pay rate by terminating his employment, in violation of Title VII and the THRA.  The Court will consider the discrimination and retaliation claims in sequence and then turn to Plaintiff's state-law claims for retaliatory discharge under the common law and the Tennessee Public Protection Act.

**A.  Title VII and THRA claims of race discrimination**

Plaintiff has not produced any direct evidence of race discrimination.  Therefore, in the absence of direct evidence, Plaintiff's claim is analyzed under the evidentiary framework for cases based on circumstantial evidence set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-805 (1973), and <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 256-259 (1981).

To establish a *prima facie* case of race discrimination under Title VII and the THRA,[1] Plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) he was treated differently than a similarly

---

[1]THRA claims are also analyzed under Title VII law.  <u>Madden v. Chattanooga City Wide Serv. Dept.</u>, 549 F.3d 666, 673 (6th Cir. 2008).

10

situated employee who was not a member of the protected class, or he was replaced by a person outside the protected class. See Laderach v. U-Haul of Northwestern Ohio, 207 F.3d 825, 828 (6th Cir. 2000). The *prima facie* requirement is not onerous and a burden easily met. Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 660 (6th Cir. 2000). If Plaintiff proves a *prima facie* case, a rebuttable presumption of discrimination arises, and the burden of production shifts to the Defendant to articulate a legitimate, non-discriminatory reason for the challenged action. Burdine, 450 U.S. at 254-256. Upon Defendant's offer of a legitimate, non-discriminatory reason, the burden shifts back to Plaintiff to demonstrate that the proffered reason is pretextual, masking intentional discrimination. Laderach, 207 F.3d at 828. The burden of persuasion remains at all times on the Plaintiff. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993).

Defendant does not dispute that Plaintiff is an African American and a member of a protected class. Defendant also does not dispute that some Caucasian workers were paid more than Plaintiff and that Plaintiff suffered an adverse employment action when he was fired.

Defendant denies, however, that Plaintiff was performing to its legitimate expectations, see McDonald v. Union Camp Corp., 898 F.2d 1155, 1160 (6th Cir. 1990), and consequently, Defendant asserts that Plaintiff cannot show he was qualified for his job in order to satisfy the *prima facie* case. Since McDonald, the Sixth Circuit has tailored the test for determining what evidence of qualifications should be considered at the *prima facie* stage. In the Plaintiff's *prima facie* case, the Court must focus on the Plaintiff's objective qualifications to determine whether he was qualified for the job of brick mason. See Wexler v. White's Furniture, Inc., 317 F.3d 564, 575 (6th Cir. 2003); Cline, 206 F.3d at 660-666. Plaintiff's burden can be met "by presenting credible evidence that his . . . qualifications are at least equivalent to the minimum objective criteria required for employment

in the relevant field."  Id. at 576.  The inquiry should look at criteria such as the Plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills.  Id.  The Court must not conflate the *prima facie* investigation into job qualifications with any evidence of lack of qualifications that Defendant may produce at the second stage of the McDonnell Douglas analysis.  Id. at 574.

Plaintiff has a high school education and is an experienced brick mason who has worked many years for various construction and masonry companies.  (Docket Entry No. 14-1, Frazier Depo. at 6-8.)  Defendant hired Plaintiff on March 11, 2006, laid him off due to a lack of work in December 2007, and then rehired him in March 2008 following the layoff.  Plaintiff continued to work for Defendant until his termination on June 13, 2008.  The record reflects that Defendant assigned Plaintiff to lay block and brick at various construction sites in Middle Tennessee, and Marvin Rochelle testified that Plaintiff's job performance was "pretty good" at the start and Plaintiff "laid a lot of block and brick[.]"  (Docket Entry No. 15-3, Marvin Rochelle Depo. at 9.)  The Court concludes there is sufficient evidence in the record to show that Plaintiff met the minimum objective criteria for a brick mason and that Plaintiff satisfies the second requirement of his *prima facie* case to show that he was qualified to hold his job.

Defendant also contends that Plaintiff cannot satisfy the fourth element of his *prima facie* case because he cannot show he was similarly situated in all relevant respects to Caucasian brick masons who were paid more than he was or that he was similarly situated to Caucasian brick masons who remained on the job or were hired after Plaintiff's employment was terminated.

To be deemed similarly-situated, the individuals with whom Plaintiff seeks comparison must have dealt with the same supervisor, have been subject to the same standards and have engaged in

the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992); Hughes v. General Motors Corp., 212 Fed.Appx. 497, 503 (6th Cir. 2007). The Plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered similarly situated. Hatchett v. Health Care and Retirement Corp. of Am., 186 Fed.Appx. 543, 548 (6th Cir. 2006). Rather, the Plaintiff and the employee with whom the Plaintiff seeks to compare himself must be similar in all of the relevant aspects. Id.; Clayton v. Meijer, Inc., 281 F.3d 605, 611 (6th Cir. 2002). This means the Plaintiff must prove that all of the relevant aspects of his employment situation are nearly identical to those of the non-minority employees who he alleges were treated more favorably. Hatchett, 186 Fed.Appx. at 548. Differences in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated. Id.; Johnson v. TCB Constr. Co., 334 Fed.Appx. 666, 669-670 (5th Cir. 2009) (to establish prima facie case of racial discrimination with respect to compensation, plaintiff must show he was paid less than member of different race was paid for work requiring substantially the same responsibility, and plaintiff must show that those workers to whom he compares himself were performing substantially the same job).

Plaintiff has not offered any specific evidence to compare himself to particular similarly-situated Caucasian brick masons employed by Defendant who were paid more than he was. He has not produced any evidence to show that his qualifications, experience, responsibilities, and work record were equal to or superior to the Caucasian brick masons who were earning more than he was. Without any evidentiary support, Plaintiff simply asserts that he was Defendant's third most senior brick mason, the only African American among the six most senior brick masons, and the only one

13

of the six most senior brick masons not to be paid $24.00 per hour. A showing of seniority alone is not sufficient in light of the cases cited above. Plaintiff must establish that he and the Caucasian brick masons to whom he compares himself dealt with the same supervisor, were subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. See Mitchell, 964 F.2d at 583. Likewise, Plaintiff has not produced any facts to show that, upon termination of his employment, he was replaced by a Caucasian brick mason or that he was singled out for termination when similarly-situated Caucasian brick masons were allowed to keep working. Thus, Plaintiff has not carried his *prima facie* burden on this fourth element of his race discrimination claim.

Moreover, Plaintiff's allegation that he did not know Defendant was not paying him union scale after May 1, 2007, when union scale rose to $24.00 per hour, is undercut by his own contradictory testimony. Plaintiff admitted in his deposition that, during the layoff from Defendant's employment from December 2007 to March 2008, he was employed for two months by Music City Masonry where he earned $24.00 per hour, which he understood to be the prevailing union wage. Plaintiff also admitted that, when he returned to the employment of Defendant in March 2008, he did not discuss pay with Phillip Rochelle, and Plaintiff also admitted that he looked at his paycheck stubs every week. Taking Plaintiff's own testimony as true, a reasonable factfinder could infer that Plaintiff would have known by looking at his paycheck stubs that Defendant was paying him $23.50 an hour upon his return in March 2008. Yet, Plaintiff also testified that he did not pay attention to what he was getting paid and he did not know he was not receiving union scale until former co-worker Gary Canon mentioned pay rates to him in May 2008.

14

Plaintiff cannot create a genuine issue of material fact by relying on his own contradictory testimony. Coffey v. Chattanooga-Hamilton County Hosp. Auth., 194 F.3d 1311, 1999 WL 824870 at *5 (6th Cir. 1999) (and cases cited therein). But even taking as true that Plaintiff did not know that Phillip Rochelle started paying brick masons based on merit in May 2007 and that Plaintiff did not know he was being paid less than union scale, Plaintiff has not produced specific facts showing that there is a genuine issue of material fact for trial on the fourth element of his *prima facie* race discrimination claim. See Celotex, 477 U.S. at 325.

If the Court assumes that Plaintiff met all four elements of his *prima facie* case, the burden of production shifts to Defendant to articulate a legitimate, non-discriminatory reason for its conduct. Phillip testified that Defendant did pay union wage when Plaintiff was first hired in March 2006, and Defendant paid union scale to Plaintiff at that time. However, in May 2006, because of problems with the union, Defendant decided not to pay every brick mason union wage, but to set rates of pay and give raises based on merit. Phillip decided to pay Plaintiff 50 cents less per hour because Plaintiff's work was rough and there were several problems with his performance. Thus, while there were Caucasian brick masons who made more money than Plaintiff, there were also African American and Caucasian brick masons who made the same or less money than Plaintiff because all were judged on merit. Moreover, according to Defendant, Plaintiff's employment was terminated because he agreed to do better and improve his work performance after receiving the back pay check, but Plaintiff's performance still languished. Defendant denies that it set Plaintiff's pay and ultimately fired him because of his race.

The Court concludes that Defendant has asserted a legitimate, non-discriminatory reason for its conduct sufficient to rebut any presumption of racial discrimination that would arise if Plaintiff

had proved his *prima facie* case.  The burden of production thus swings back to Plaintiff to prove that Defendant's stated reasons are a pretext for race discrimination.  To show pretext, Plaintiff must produce evidence that Defendant's asserted reasons had no basis in fact, the reasons did not in fact motivate the adverse employment action, or the reasons were insufficient to motivate the adverse employment action.  Laderach, 207 F.3d at 828.

Plaintiff has not come forward with any evidence to refute the legitimate, non-discriminatory reasons given for his lower pay and his discharge.  He provides no evidence that Defendant's asserted reasons for its actions had no basis in fact, the reasons did not in fact motivate the adverse employment action, or the reasons were insufficient to motivate the adverse employment action. Id.  Plaintiff has not presented any evidence to suggest that Defendant's decisions were motivated by racial animus, nor has he produced any testimony by supervisors or co-workers to contradict the testimony of Phillip and Marvin that Plaintiff, in fact, had performance problems.  The fact that Plaintiff disagrees with Defendant's assessment of his performance does not render Defendant's reasons pretextual.  McDonald, 898 F.2d at 1162.  He claims that he performed well and his work was not rough, but Plaintiff's subjective beliefs and his perception of his own performance are not relevant.  Ervin v. Nashville Peace and Justice Ctr., 673 F.Supp.2d 592, 609 (M.D. Tenn. 2009). Rather, it is the perception of the decision maker that is relevant.  See Dale v. Chicago Tribune Co., 797 F.2d 458, 464-465 (7th Cir. 1986).  Plaintiff has produced nothing more than his own self-serving and conclusory assertions that Defendant was motivated by race discrimination.  Ervin, 673 F.Supp.2d at 610.  See also Hatchett, 186 Fed.Appx. at 549-550 (noting plaintiff did not present any evidence of pretext; thus, there was no basis for jury to conclude that the employer's proffered

reasons for pay disparities were false and that actual reason Hatchett was paid less than another was due to Hatchett's race).

For these reasons, the Court concludes that Plaintiff has not generated a genuine issue of material fact for trial on his Title VII and THRA race discrimination claims concerning disparate pay and employment termination.

## B. Retaliation claim under Title VII and THRA

To establish a *prima facie* case of retaliation, Plaintiff must show that: (1) he engaged in protected activity; (2) the employer had knowledge of his exercise of his protected rights; (3) he suffered an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action. Hatchett, 186 Fed. Appx. at 550. The same burden-shifting paradigm applicable to a race discrimination claim utilized above also applies to a retaliation claim. Harris v. Metropolitan Gov't of Nashville and Davidson County, 594 F.3d 476, 484-485 (6th Cir. 2010).

The Court concludes that Plaintiff engaged in protected activity by complaining to Phillip Rochelle that he was being paid less than other brick masons due to his race. 42 U.S.C. § 2000e-3(a); Barrett v. Whirlpool Corp., 556 F.3d 502, 516 (6th Cir. 2009) ("[a]n employee has engaged in opposing activity when she complains about unlawful practices to a manager[.]") Although the Court questions whether, on this record, Plaintiff has demonstrated that his opposition was reasonable and based on a good-faith belief that the employer was acting in violation of Title VII, Barrett, 556 F.3d at 516, the Court assumes that Plaintiff carried this burden. The employer knew Plaintiff had engaged in protected activity because Phillip Rochelle was the head of the company, and Phillip admitted that Plaintiff complained directly to him. Plaintiff's employment was

17

terminated, so Plaintiff suffered an adverse employment action. Plaintiff complained that his pay was racially discriminatory on or before May 30, 2008. Plaintiff was terminated on June 13, 2008, less than two weeks later. Thus, a causal connection exists between Plaintiff's protected activity and the adverse employment action. See Armstrong v. Whirlpool Corp., 2010 WL 273691 at *14 (6th Cir. Jan. 26, 2010) ("'Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation.'" (quoted case omitted)).

Defendant offers as a legitimate, non-discriminatory reason for its conduct that Plaintiff was terminated for performance issues. Even though Plaintiff complained of race discrimination, Phillip gave Plaintiff a retroactive raise to $24.00 per hour and paid him back pay of $.50 per hour for 1,437 hours of work. Defendant asserts that Phillip did this in order to motivate Plaintiff to do his job and to increase his production and quality of work. Even though Defendant gave Plaintiff the back pay and instructed him to improve his job performance immediately, Plaintiff did not improve his performance. Therefore, he was fired.

In light of this proffered non-discriminatory reason for Defendant's conduct, Plaintiff must show that the reason given was really a pretext for retaliation. At this point in the analysis, temporal proximity alone cannot fulfill Plaintiff's proof of pretext; temporal proximity is only indirect evidence that may be used to support the assertion of pretext. Lindsay v. Yates, 578 F.3d 407, 421 (6th Cir. 2009). Other than the temporal proximity between Phillip's payment of the back pay check to Plaintiff and Plaintiff's firing hours later, Plaintiff has produced no evidence that Phillip acted out of retaliatory animus because Plaintiff complained to him about pay disparity based on race before

May 30, 2008.  Plaintiff's own conclusory statements that he was the victim of retaliation is not sufficient to overcome a motion for summary judgment.  McDonald, 898 F.2d at 1162; Ward v. City of Streetsboro, 89 F.3d 837 (Table), 1996 WL 346812 at *5 (6th Cir. 1996).  Therefore, the Court concludes that Plaintiff has not carried his burden to generate a genuine issue of material fact for trial on his retaliation claims brought under Title VII and the THRA.

**C.  Tennessee retaliatory discharge claims**

To establish a cause of action under Tennessee's Public Protection Act, informally referred to as the "Tennessee Whistleblower Act," a plaintiff must prove: (1) his status as an employee of the defendant employer; (2) his refusal to participate in, or remain silent about, "illegal activities" as defined under the Act; (3) his termination; and (4) an exclusive causal relationship between his refusal to participate in or remain silent about illegal activities and his termination.  Counce v. Accension Health, 2010 WL 786001 at *4 (Tenn. Ct. App. Mar. 8, 2010).  Tennessee's common law claim for retaliatory discharge has similar elements requiring the plaintiff to show: (1) that an employment-at-will relationship existed; (2) that he was discharged; (3) that the reason for his discharge was that he attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge him was his exercise of protected rights or his compliance with clear public policy.  Id.  "The statutory cause of action and the common law cause of action differ in that under the statute, the employee's protected activity must be the *sole* reason for the discharge, while under the common law cause of action, the employee's action must merely be a *substantial factor* in bringing about the discharge."  Id. (emphasis in original).

19

The Tennessee Whistleblower Act is cumulative to the common law cause of action for retaliatory discharge, which means that the plaintiff may bring simultaneous common law and statutory claims. Burnett v. America's Collectibles Network, Inc., 2010 WL 669246 at *6 (Tenn. Ct. App. Feb. 25, 2010). Under both causes of action, the plaintiff must show that his whistleblowing action serves a public purpose that should be protected. Id. So long as the employee's actions are not merely private or proprietary, but instead seek to further the public good, the decision to expose illegal or unsafe practices should be encouraged. Id.

Plaintiff has not shown under Tennessee statute that his complaints about racially discriminatory pay were the sole reason for his discharge. Additionally, Plaintiff's complaints against the Defendant were private complaints that do not bring him under the protection of either the common law or the statutory causes of action for retaliatory discharge because his complaints did not raise matters of public concern important to the public health, safety or welfare. Id. An alleged illegal activity or violation by an employer, in addition to being against a civil statute, must implicate important public policy concerns as well. Id. The causes of action are construed narrowly because they are exceptions to the employment-at-will doctrine. Id. Plaintiff's action in complaining to Defendant that he believed his pay was racially discriminatory appears to have originated from a merely private concern because Plaintiff produced no evidence that he made his complaints for greater public purposes than increasing his own pay.

Finally, the Court concludes that Plaintiff's state-law claims fail for the same reason his federal claims fail: he has not produced sufficient evidence of pretext to overcome the motion for summary judgment. See Kinamore v. EPB Elec. Utility, 92 Fed. Appx. 197, 207-208 (6th Cir. 2004) (applying Tennessee law to hold that where defendant counters prima facie case of retaliatory

discharge with legitimate, non-discriminatory reasons for its actions, plaintiff must show reasons are pretextual).

## IV. CONCLUSION

For all of the reasons stated, Defendant's Motion For Summary Judgment (Docket Entry No. 9) will be granted and this case will be dismissed with prejudice.

An appropriate Order shall be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE